# EXHIBIT B

**TRADE AGREEMENT**

between

**District Council No. 9, Drywall Tapers and Pointers**

**of Greater New York Local Union 1974, affiliated with**

**International Union of Painters and Allied Trades,**

**AFL-CIO**

and

**Drywall Taping Contractors' Association**

**of Greater New York**

and

**The Association of Wall-Ceiling & Carpentry Industry**

**of New York, Inc.**

**June 28, 2017**

to

**June 27, 2020**

**INDEPENDENT AGREEMENT**

between

**District Council No. 9, Drywall Tapers and Pointers**

**of Greater New York Local Union 1974, affiliated with**

**International Union of Painters and Allied Trades,**

**AFL-CIO**

and

**Employer**

JDeL
2-6-18

**DISTRICT COUNCIL NO. 9, DRYWALL TAPERS AND POINTERS**

**OF GREATER NEW YORK LOCAL 1974**

**International Union of Painters and Allied Trades**

**45 WEST 14TH STREET**

**NEW YORK, NY 10011**

**TEL: (212) 242-8500**

**DRYWALL TAPING CONTRACTORS' ASSOCIATION**

**OF GREATER NEW YORK**

**7 RAILROAD STREET**

**GREENLAWN, NY 11740**

**TEL: (631) 261-4875**

**WALL-CEILING & CARPENTRY INDUSTRIES**

**OF NEW YORK, INC.**

**125 JERICHO TPK, #301**

**JERICHO, NY 11753**

**TEL: (516) 478-5600**



# INDEX

|  | Page |
|---|---|
| Alternative Dispute Resolution, Art. XXIX | 40 |
| Annuities, Art. XX, Sec. 6 | 35 |
| Apprentices, Art. VII, Sec. 1 | 9 |
| Apprentice Committee, Art. VII, Sec. 2 | 11 |
| Arbitration, Art. XIII, Sec. 2 | 19 |
| Audit Fee, Art. VIII, Sec. 1 (e) | 12 |
| Business Manager and Organizers, Art. XII | 18 |
| Checks, Payments by, Art. VIII, Sec. 1 (a) | 11 |
| Complaints, Protection of, Art. XIII, Sec. 5 | 21 |
| Delinquent Employers, Art. XX, Sec. 7 | 35-36 |
| Designation of Journeypersons as Penalty for Employer Violations, Art. XIII, Sec. 10 | 25 |
| Drinking Water, Art. XVIII, Sec. 3, Rule 3 | 29 |
| Dues Check-Off, Art. III, Sec. 1 thru 4 | 6 |
| Eating Place, Art. XVIII, Sec. 3, Rule 4 | 29 |
| Elevators, Art. XVIII, Sec. 3, Rule 7 | 29 |
| Employer Contributions, Enforcement of, Art. XX, Sec. 7 | 35-36 |
| Employers' Records, Art. VIII, Sec. 1 (e) | 12 |
| Employment of Non-Member, Art. I, Sec. 5, Sec. 5 (c) | 3 |
| Escrow Bonds, Art. VIII, Sec. 1 (f) | 12 |
| Foreperson, Art. IX | 13 |
| Fringe Benefit Funds, Art. XX, Sec. 1 thru 6 | 30-35 |
| Grievance Procedure, Art. XIII, Sec. 1 | 18 |

i

| | |
|---|---|
| Health Rules, Art. XVIII, Sec. 1 to 3, Rules 1 thru 17 | 28-30 |
| Hiring Additional Journeymen, Art. I, Sec. 5 (c) | 3 |
| Holidays, Art. IV, Sec. I (c) | 7 |
| Independent Agreement | Appendix A |
| Injuries, Art. II, Sec. 6, Art. XVIII, Sec. 3, Rule 6 | 5, 29 |
| Insurance (Employers'), Art. XIX | 30 |
| Insurance Fund, Art. XX, Sec. 4 | 34 |
| Job Stewards, Art. X | 14 |
| Joint Board, Art. XIV, Art. XV | 25 |
| Joint Board Annual Contribution, Art. XV | 25 |
| Joint Committee, Art. XIII, Sec. 1 (c) | 18 |
| Joint Health Committee, Art. XVII | 28 |
| Journeypersons (defined) | 1 |
| Jurisdiction, Art. 1, Sec. 1 | 1 |
| Jurisdictional Disputes, Art. XXIV | 38 |
| Late Payment of Wages, Penalty, Art. VIII, Sec. 1 (b) | 11 |
| Layoff Pay, Art. II, Sec. 5 | 5 |
| Lockers, Art. XVIII, Sec. 3 | 28 |
| Lumping Prohibited, Art. XVI, Sec. 7 | 28 |
| Market Recovery, Art. XXVII, Sec. 1, 2 | 39 |
| Mutual Good Faith, Art. I, Sec. 5 (a) | 3 |
| National Labor Relations Act, Art. XXVI | 38 |
| No Strikes or Lockouts, Art: XXII | 37 |
| Non-Discrimination, Art. I, Sec. 5 (b) | 3 |

ii

One and One Half Time Overtime Work, Art. IV, Sec. 1 (c) — 7

One Job Agreement — Appendix B

Out-Of-Town Work, (50-50 Clause), Art. V — 8

Overnight Expenses, Art. VI, Sec. 2 (a) — 9

Overtime Pay, Art. IV, Sec. 1 (c) — 7

Overtime Permits, Art. IV, Sec. 1 (b) — 7

Overtime: Share-the-Work, Art. IV, Sec. 1 (b) — 7

Overtime Violations, Art. IV, Sec. 1 (e) — 8

Payroll Reports, Art. XX, Sec. 1 (f) — 34

Penalty Payments, Art. XX, Sec. 7 (b) — 35

Pension Fund, Art. XX, Sec. 5 — 35

Powdered Compound Mixtures, Art. XVIII, Sec. 3, Rule 10 — 29

Preservation of Work Clause, Art. XVI, Sec. 6 — 27

Promotional Fund and IUPAT Political Action Fund, Art. XXI — 36

Registration of Jobs, Art. XI — 17-18

Reopener, Art. II, Sec. 3 — 5

Rest Periods, Art. XVIII, Sec. 3, Rule 1 — 28

Safe Work Benches, Art. XVIII, Sec. 3, Rule 13 — 30

Safety Belts, Art. XVIII, Sec. 3, Rule 15 — 30

Safety Masks, Art. XVIII, Sec. 3, Rule 9 — 29

Scaffold Work, Art. XVIII, Sec. 3, Rule 13 — 30

Section 9 (a) Agreement, Art. I, Sec. 4 — 2-3

Shop Stewards, Art. X, Sec. 2 — 15

Show-Up Time, Art. II, Sec. 4 — 5

Target DC 9 2017-2020 Final 02 05 2018

Special Organizing Jobs, Art. XXVII     39

Standard Work Week, Art. IV, Sec. 1     6

Stewards (Job and Shop), Art. X, Sec. 1 and 2     14-15

Stewards, Appointment of, Art. X, Sec. 2-4     15-16

Stewards' Duties, Time For, Art. X, Sec. 3     16

Subcontracting, Art. XVI, Sec. 1, 2, 3, 4, 5     26-27

Term of Agreement, Art. XXV     38

Toxic or Irritant Materials, Art. XVIII, Sec. 3, Rule 11 and 12     29-30

Travel Pay (out-of-town work), Art. VI, Sec. 1     9

Trust Fund Hearing, Art. XX, Sec. 7 (e)     36

Unemployment-30% Clause, Art. IV, Sec. 1 (a)     6

Vacation Fund, Art. XX, Sec. 4 (ii)     35

Wage Payments, Art. VIII, Sec. 1 (a) (b) (c)     11-12

Wages, Art. II, Sec. 1     4

Wages, Employer's Statement of, Art. VIII, Sec. 1 (c)     12

Wages, Late Payment of, Art. VIII, Sec. 1 (b)     11

Wages, Payment of, Art. VIII, Sec. 1     11

Wages, Security for, Art. VIII, Sec. I (f) to (h)     12-13

Washing Facilities, Art. XVIII, Sec. 3, Rule 2     28

Weekend Work (Saturdays and Sundays), Art. IV, Sec. 1 (c)     7

Work Clothes, Art. XVIII, Sec. 3, Rule 5     29

Work Week, Art. IV, Sec. 1 (a)     6

TapersCBA2017-2020-Final02052-018

# TRADE AGREEMENT

## between

### Drywall Tapers and Pointers of Greater New York

### Local Union 1974 affiliated with

### International Union of Painters and Allied Trades, AFL-CIO

### and

### Drywall Taping Contractors' Association of

### Greater New York and The Association of Wall-Ceiling & Carpentry Industries of New York, Inc.

THIS AGREEMENT, hereinafter designated as the Trade Agreement, dated this 28th day of June 2017 by and between the Drywall Taping Contractors' Association of Greater New York and The Association of Wall-Ceiling & Carpentry Industries of New York, Inc., two separate and unrelated Associations hereinafter collectively designated as the "ASSOCIATIONS", and District Council No. 9, Drywall Tapers and Pointers of Greater New York, Local Union 1974, affiliated with the International Union of Painters and Allied Trades, AFL-CIO, hereinafter designated as the "UNION".

WITNESSETH as follows:

WHEREAS, the parties hereto desire to establish terms and conditions upon which workers employed by members of the ASSOCIATIONS, hereinafter designated as "EMPLOYERS", shall perform tapers', finishing and pointers' work. Such workers are referred to below as "EMPLOYEES". Workers employed or seeking employment by Employers to perform such work are referred to below as "JOURNEYPERSONS" and "APPRENTICES". It is agreed that the word "JOURNEYPERSONS" means a worker who is not presently a participant in the apprenticeship program described in Article VII herein, and that the word "APPRENTICE" means one who is. The word "EMPLOYEES" means all JOURNEYPERSONS and all APPRENTICES.

NOW THEREFORE, the parties hereto agree as follows:

ART. I. SECTION 1. The terms of this Trade Agreement shall govern all tapers', finishers' and pointers' work as hereinbelow defined performed within New York City and parts of Nassau County by any Employer as hereinabove defined. They shall apply to all Employees of any Employer, regardless of whether any or all such Employees are members of the Union. Tapers' Finishers' and Pointers' work is defined to include, but not be limited to: the preparation or leveling



of any surface or substrate which is to receive a coating, finish and/or wall covering; this will include, but not be limited to, all levels of finishing and/or spackling of all surfaces, including gypsum wallboard taping and finishing, fire taping and all fire-stopping systems, glaze coatings, skim coating, spraying or any other finishing system, spotting or nails, finishing of corner beads/flex beads.

Patching and sanding is within the system of preparing surfaces for finishes. All stucco and dryvit systems will be performed by members of the International Union.

SECTION 2. The geographical jurisdiction of the Union consists of the following: The counties of Bronx, Kings, New York, Queens, Richmond and parts of Nassau including: Atlantic Beach, Ceaderhurst, East Rockaway, Gibson, Hewlett, Hewlett Bay, Hewlett Neck, Hewlett Park, Inwood, Lawrence, Lido Beach, Long Beach, parts of Lynbrook, parts of Oceanside, parts of Valley Stream, and Woodmere.

Starting on the South Side of Sunrise Highway in Valley Stream running east to Windsor and Rockaway Avenue, Rockville Centre is the boundary line up to Lawson Boulevard, turn right going west all the above territory is part of Drywall Tapers' and Pointers' of Greater New York Local Union 1974.

Starting at Union Turnpike and Lakeville Road going north to Northern Boulevard the west side of Lakeville road to Northern Boulevard is part of Drywall Tapers' and Pointers' of Greater New York Local Union 1974. At Northern Boulevard going east the district north of Northern Boulevard to Port Washington Boulevard is part of Drywall Tapers' and Pointers' of Greater New York Local Union 1974. West of Port Washington Boulevard to St. Francis Hospital then north of first traffic light to Port Washington and Sands Point, Manor Haven, Harbour Acres is part of Drywall Tapers' and Pointers' of Greater New York Local Union 1974.

Towns included in the above boundaries are Bakers Point, Flower Hill, Great Neck, Great Neck Estates, Harbour Acres, Kensington, Kings Point, Lake Success (west of Lakeville Road), Manhasset, Manor Haven, Munsey, Plandome, all area north of Northern Boulevard to Port Washington Boulevard, and Sands Point is part of Drywall Tapers' and Pointers' of Greater New York Local Union 1974.

SECTION 3. No Employer will execute any agreement with a union other than Local Union 1974 in connection with work covered by this Agreement unless directed to do so by Government order or regulation.

SECTION 4. The Associations on behalf of themselves and each of their members, hereby recognizes the Union as the collective bargaining representative of all the Employees covered by this Agreement. Any non-member signatory who becomes party to this Agreement does hereby likewise recognize the Union as the collective bargaining representative of all the Employees of

2

said Employer covered by this Agreement. Inasmuch as the Union has requested recognition from the Employer as the sole and exclusive bargaining representative of the Employees in the bargaining unit described herein within the meaning of Section 9(a) of the National Labor Relations Act, and has submitted, or offered to submit, proof thereof in the form of signed and dated authorization cards, and the Employer is satisfied that an uncoerced majority of its Employees desire the Union to be their sole and exclusive representative within the meaning of Section 9(a) of the Act in the bargaining unit described herein, pursuant to Section 9(a) of the Act, the Employer hereby recognizes the Union as the sole and exclusive collective bargaining representative of its Employees on all present and future job sites within the jurisdiction of the Union, unless and until such time as the Union loses its status as the Employees' exclusive representative as a result of an NLRB election requested by the Employees. The Employer agrees that during the life of this Agreement it will not request an NLRB election and expressly waives any right it may have to do so.

SECTION 5.

(a) The Associations obligate themselves for their members and the Union obligates itself for its members that they and each of them in good faith will live up to and conform with all the provisions of this Trade Agreement and to all rules, regulations and procedures promulgated under and pursuant to the terms of this Agreement, provided, however, that the Associations shall not be obligated to take any action to require compliance with the terms of the Trade Agreement on the part of any person or firm which has been expelled from or has validly resigned from the Associations except as a prerequisite for the reinstatement of such member.

(b) No party to the Agreement shall discriminate against any Employee with respect to employment or union membership by race, creed, color, national origin, gender (including gender identity), age, sexual orientation, disability, marital status, citizenship status or any other characteristics protected by federal, state or local law.

(c) All Journeypersons and Apprentices who are members of the Union at the time of hiring shall remain in good standing as a condition of continued employment. Should any Journeyperson or Apprentice employed by the Employer not be a member of the Union at the time of hiring, they shall be required to become a member of the Union by the eighth (8th) day after starting to work in the Union section of the Industry and they shall remain a member in good standing as a condition of continued employment. The Employer shall be free to hire Journeypersons or Registered Apprentices from any source. However, no Employer shall seek to hire Journeypersons or Apprentices through an Employment Agency. Any Employer hiring a non-union Journeyperson or Apprentice shall first report the same to the Union and the said non-union Journeyperson or Apprentice shall, before commencing work, register with the Union.

3

Taperst 13.\3017-29 20-4 nnd020 5 2018



ART. II. SECTION 1. WAGES. The wage and benefits package shall increase $1.60 per contract year. The increases shall be allocated as determined by the Union.

(a) The rate of wages for all Journeypersons covered by this Agreement shall be as follows: for the period commencing June 28, 2017 and terminating  December 26, 2017,  $47.82 per hour; for the period commencing December 27, 2017 and terminating June 27, 2018, wages per hour shall be allocated upon determination of the Union; for the period commencing June 28, 2018 and terminating  June 27, 2019,  wages per hour shall be allocated upon determination of the Union; for the period commencing  June 28, 2019 and terminating  June 27, 2020, wages per hour shall be allocated upon determination of the Union;

(b) The rate of wages for all Apprentices covered by this Agreement enrolled in the Three Year Apprentice Program shall be as follows: for the period commencing June 28, 2017 and terminating December 26, 2017: 1st Year Apprentice $19.45 per hour, 2nd Year Apprentice $28.69 per hour, 3rd Year Apprentice $38.26 per hour; for the period December 27, 2017 and terminating June 27, 2018 wages per hour shall be allocated upon determination of the Union; for the period June 28, 2018 and terminating June 27, 2019, wages per hour shall be allocated upon determination of the Union; for the period June 28, 2019 and terminating June 27, 2020, wages per hour shall be allocated upon determination of the Union.

(c) The rate of wages for all Apprentices covered by this Agreement enrolled in the Four Year Apprentice Program shall be as follows: for the period commencing June 28, 2017 and terminating December 26, 2017: 1st Year Apprentice $19.45 per hour, 2nd Year Apprentice $23.91 per hour, 3rd Year Apprentice $28.69 per hour, 4th Year Apprentice $38.26 per hour; for the period December 27, 2017 and terminating June 27, 2018, wages per hour shall be allocated upon determination of the Union; for the period June 28, 2018 and terminating June 27, 2019, wages per hour shall be allocated upon determination of the Union; for the period June 28, 2019 and terminating June 27, 2020, wages per hour shall be allocated upon determination of the Union.

SECTION 2. COST OF LIVING ADJUSTMENTS.

(a) Effective dates. Costs of living wage adjustments shall be made effective July 1st of each year throughout the duration of this Agreement.

(b) BASIS FOR ADJUSTMENT. The amount of the cost-of-living adjustment shall be determined and re-determined as provided in (c) below on the basis of the official Consumer Price Index for urban Wage Earners and Clerical Workers (including single workers) published by the Bureau of Labor Statistics, U.S. Department of Labor (1967=100) and referred to herein as the Index.

(c) AMOUNT OF ALLOWANCE. The amount of the cost-of-living adjustment shall be computed as follows: On May 28, 2017 the most recent and available (the month prior to the anniversary date) Index number shall be compared to the Index number a year prior and a percent change

4

computed. The figure of eight percent (8%) shall then be deducted therefrom. The remaining percent change shall be applied to all rates as mentioned in (d) below, but in no event shall the cost-of-living adjustment be greater than three percent (3%).

(d) APPLICATION OF ADJUSTMENT. The cost-of-living adjustment shall be taken into account in computing overtime, and in determining call-in pay as well as the base hourly rate for all classifications.

(e) Nothing in this Article shall provide an adjustment for a decline in the Index.

SECTION 3. REOPENER. The parties agree to meet at the end of each contract year for the purpose of reviewing the financial condition of the drywall finishing industry and the fringe benefit funds to determine whether it is necessary to reopen the financial terms of the Agreement.

SECTION 4. SHOW-UP TIME. Employees who are not put to work after having been instructed to come to work shall be paid for two (2) hours, except when they are not put to work because of an act of God or because of an accident beyond the Employer's control.

SECTION 5. LAY-OFF PAY. Journeypersons and Apprentices laid off shall be paid the full day's wages if laid off during the day except when such lay-off is caused by weather conditions or by completion of the job. Should the Employee receive notice of lay-off for reasons other than the completion of the job or weather conditions then they shall receive a full day's wages one (1) hour before the end of the work day. Failure to properly notify the Employee shall result in additional damages to be paid by the Employer, the terms to be determined by the Joint Board.

SECTION 6. INJURIES. There shall be no lost time in wages to any Employee on the day of injury when immediate medical attention is required for any Employee injured on the job, provided the Employee submits proof that they have gone to a doctor or clinic for diagnosis or treatment.

SECTION 7. SICK LEAVE. The parties understand that the New York City Council has passed legislation entitled the "earned Sick Time Act" ("the Act"). The parties expressly waive the provisions of the Act. Further, the parties agree and acknowledge that this Agreement provides benefits comparable to those provided by the Act to the Employees covered by this Agreement. If the Act is revised in such manner as to make this waiver ineffective, this waiver is deemed ineffective or invalid (in whole or in part) by a court or other body, or this waiver is ineffective or invalid for any other reason, the parties agree to replace this paragraph with appropriate language to waive the Act's provisions.

ART. III. SECTION 1. DUES CHECK-OFF.

(a) Every Employer signatory to the Agreement hereby agrees to check-off from the wages of any Employee employed by such Employer during the term of this Agreement administrative dues in the amount specified in the Union's by-laws and to remit said amount to the Union.

(b) At the signing of this Agreement, the Union advises the Employer, and the Employer agrees, that the amount of administrative dues presently specified in the by-laws, due the Union on behalf of each Employee, is four and one-half percent (4.5%) of such Employee's gross wages. In the event that the Union by resolution or by-law amendment shall change the amount of administrative dues so specified, the Union shall so inform the Employer.

SECTION 2. When a signatory Employer performs a job within the jurisdiction of a union affiliated with the International Union of Painters and Allied Trades "IUPAT" other than the Union signatory hereto and the by-laws of that other union contains a provision for administrative dues or business agent "assessment", the Employer shall check-off from the wages of Employees covered by this Agreement and employed on that job administrative dues or business agent "assessment" in the amount stated in that other union's by-laws, and shall remit said amount to that other union. In that event, the other union shall be acting as agent of the signatory Union for the purpose of policing and administrating this Agreement. In performing the check-off, the procedure specified in Section 1, sub-sections (a) and (b), will be followed, except that it shall be the responsibility of said other union to notify the Employer in writing of the amount of administrative dues or business agent "assessment" specified in its by-laws, and to submit to the Employer a copy of the by-laws or the applicable by-law provision. When the signatory Employer performs a job within the jurisdiction of a union affiliated with the IUPAT other than the Union signatory hereto, and the by-laws of that other union contain no provision for administrative dues or business agent "assessment", the Employer shall continue to be bound by Section 1. If the by-laws of the other union provide for administrative dues or business agent assessment at a lower percentage than four and one-half percent (4.5%) of the Employee's gross wages, the Employer shall remit the balance to the signatory Union.

SECTION 3. The obligations of the Employer under Sections 1 and 2 shall apply only as to Employees who have voluntarily signed a valid dues deduction authorization card.

SECTION 4. At the time of employment of any Employee, the Employer will submit to each Employee for his/her voluntary signature a dues deduction authorization card in triplicate, one copy of which is retained by the Employer supplied to such Employer by the Union.

ART. IV. SECTION 1.

(a) FIVE (5) DAY WEEK, SEVEN (7) HOUR DAY: The regular time shall consist of thirty-five (35) hours per week divided into five (5) work days (from Monday to Friday inclusive) of seven

6

(7) hours each. The work day shall be from 8:00 A.M. to noon and from 12:30 P.M. to 3:30 P.M. or from 7:00 A.M. to 12:00 P.M. and from 12:30 P.M. to 2:30 P.M. or from 9:00 A.M. to 1:00 P.M. and from 1:30 P.M. to 4:30 P.M. Any job wishing to have a one hour lunch period shall request permission from the Union before instituting this procedure. The Union shall have the authority to grant a 6:00 A.M. start at the request of an Employer.  The work week shall begin on Wednesday and end on the following Tuesday. The Union shall have the power, at the request of any Employer, to change the regular work hours of each Employee.

For Project Labor Agreement jobs and special industry jobs, approved by the Union, the regular time shall consist of forty (40) hours per week divided into five (5) work days (from Monday to Friday inclusive) or eight (8) hours each.

At any time that unemployment in the trade equals or exceeds thirty percent (30%) the Union may order reduction of the work week, except for Project Labor Agreement jobs.

(b) OVERTIME PERMITS: An overtime permit shall be obtained in advance from the Union for any overtime work and the permit shall be posted on the job, except when the circumstances make this impossible. The Employer's request for an overtime permit shall be telephoned or faxed to the Union prior to the granting of the permit. The Employer shall notify the Job Steward at the time of making the request to the Union.

During the course of the year all Journeypersons and Apprentices in the shop shall be given an equal share of all overtime work where possible, and the assignment of such work shall be done in consultation with the Steward.

Before any overtime permit is issued, the Employer requesting the same shall submit to the Union a list of all his/her taping Employees who shall perform such overtime work.

(c) OVERTIME WORK AND HOLIDAYS: Work done outside of regular time or work beyond seven (7) hours in a day, except for work done on Project Labor Agreement and special industry jobs, and all work done on Saturday, Sunday, New Year's Day, Martin Luther King, Jr. Day, President's Day, Good Friday, Memorial Day, Independence Day, Columbus Day, Thanksgiving Day, the last legal working day before Christmas, Christmas Day and the last legal working day before New Year's Day shall be paid for at one and one half (1 1/2) times the rate of regular time. NO WORK SHALL BE DONE ON LABOR DAY. Work performed on the afternoon of said days shall be paid at the overtime rate. No fringe benefit contributions shall be payable on the half-holidays referred to above. Fringe benefit contributions for overtime hours shall be payable at the straight time rate.

(d) In the event that the Joint Board shall find the Employer guilty of violating the overtime provision of the Trade Agreement, it may authorize the Union to place fifty percent (50%) of the overtime workers on the Employer's jobs for the period of one (1) year.  Furthermore, during the

Tapers CBA2017-2020-Final02052018

JRL
2-6-18

six (6) months following such findings of guilt, the Joint Board may require that the overtime compensation becoming due to the Employees shall be transmitted to the Union in the form of a separate check payable to each Employee for the full overtime compensation, without deductions, the legal deductions to be made from the straight time compensation which is paid directly to the Employee.

(e) Saturday, Sunday and overtime work shall not be permitted except when unavoidable, in which case a written consent via fax shall be obtained from the Union.

(f) The Union may permit shift work on construction projects when requested by the Employer. The shift rate of pay shall be 8 hours pay for 7 hours work or 9 hours pay for 8 hours of work. The request for shift work must be for a minimum of three consecutive nights. The Employer must register the job to make a request for shift work.

ART. V. OUT-OF-TOWN WORK: When Local Union 1974 Journeypersons or Apprentices work out-of-town for an Employer both the Employer and the Employee shall notify Local Union 1974 prior to the commencement of the work. Local Union 1974 Journeypersons and Apprentices working out-of-town shall receive the wages and work the hours provided for in this Trade Agreement unless local wages are higher, in which case they shall receive the local wages, unless Government regulations provide otherwise.

Out-of-town work constitutes work which is located outside the geographical jurisdiction of the Union.

The Employer party hereto shall, when engaged in work outside the geographic jurisdiction of the Union party to the Agreement, comply with all of the lawful clauses of the Collective Bargaining Agreement in effect in said other geographic jurisdiction and executed by the Employers of the industry and the affiliated Local Unions in that jurisdiction, including but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; provided, however, that as to Employees employed by such Employer from within the geographic jurisdiction of the Union party to this Agreement and who are brought into an outside jurisdiction, such Employee shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction whichever are more favorable to such Employees, and fringe benefit contributions on behalf of such Employees shall be made solely to their home funds in accordance with their governing documents. This provision is enforceable by the Local Union or District Council in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable Collective Bargaining Agreement and through the courts, and is also enforceable by the Union party to the Agreement, both through the procedure for settlement of grievances set forth in the Agreement and through the courts.

8



When engaged in work outside the geographical jurisdiction of this Agreement, the Employers agree, subject to their rights to reject any applicant for cause, that not less than 50% of the Journeypersons employed on such work will be residents of the area where the work is performed or are customarily employed a greater percentage of their time in such area, and further provided that these Journeypersons are qualified to meet the job requirements.

When an Employer (other than an Employer in the special branches) does any work outside his/her home city or town and in a locality where a District Council or Local Union exists, not less than 50% of the Journeypersons employed on such work shall be residents of or employed the greater percentage of their time in such locality; any others shall be employed only from the contractor's home locality.

The contractor of the Employer party to the Agreement, when engaged in work outside the geographical jurisdiction of the Union party to this Agreement, shall employ not less than 50% of the Journeypersons employed on such work from the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area; any others shall be employed only from the contractor's home area.

Out-of-town workers employed by the Employer party to this Agreement shall register with the Union when engaged in work within the geographical jurisdiction of the Union, in accordance with the IUPAT Constitution.

ART. VI. SECTION 1. TRAVEL PAY. On all out-of-town jobs located more than fifty (50) miles from the Union office the Journeypersons shall be provided by the Employer with transportation. All time consumed in traveling to and from the place shall be paid for at the regular rate of wages, but shall not exceed eight (8) hours in every twenty-four (24) hours. A Journeyperson going out-of-town at night shall not be paid, but sleeping accommodations and meals shall be provided.

SECTION 2.

(a) Employees required to remain out-of-town overnight or longer shall be paid one (1) hour additional per day, and shall be provided with suitable hotel accommodations and an allowance in addition to $60.00 per day for board.

(b) Employees required by their Employers to use cars shall be paid at the rate of fifty-five cents (.55) per mile for such car use.

(c) In all cases, all fares in excess of five dollars ($5.00) per day shall be paid by the Employer and if the job is located more than one mile from the railroad or bus station, the Employer shall provide traveling facilities.

ART. VII. SECTION 1. APPRENTICES.

(a) Commencing on June 28, 2017 and for the duration of this Trade Agreement, the Associations agree that the Employer shall make payments to the District Council #9 Finishing Trade Institute of New York at the rate of $0.50 cents per hour. Apprentices shall be trained pursuant to the District Council #9 Finishing Trade Institute of New York program.  Upon approval by the New York State Department of Labor, the Apprentice Program for newly enrolled apprentices shall be increased to 48 months. All existing apprentices shall continue their 36-month program. The rate of wages for apprentices shall be as follows:

**36 Month Program:**

Wages for the first twelve months of apprenticeship are contained in Article II, Section 1.

Wages for the second twelve months of apprenticeship are contained in Article II, Section 1.

Wages for the third twelve months of apprenticeship are contained in Article II, Section 1.

After the thirty-sixth month, subject to the rules of the program, such Apprentice shall be considered a full-fledged Journeyperson and shall receive full Journeyperson's wages.

**48 Month Program:**

Wages for the first twelve months of apprenticeship are contained in Article II, Section 1.

Wages for the second twelve months of apprenticeship are contained in Article II, Section 1.

Wages for the third twelve months of apprenticeship are contained in Article II, Section 1.

Wages for the fourth twelve months of apprenticeship are contained in Article II, Section 1 .

After the forty-eighth month, subject to the rules of the program, such Apprentice shall be considered a full-fledged Journeyperson and shall receive full Journeyperson's wages.

(b) One Apprentice, but no more, may be employed on any job for every three (3) Journeypersons with a maximum, however, of five (5) Apprentices on any single job.

(c) Upon the failure of the Employer to comply with the terms of (b) above, the Joint Board, after due notice to the Employer, shall designate the appropriate number of apprentices to be employed by that Employer.

(d) No Apprentice receiving less than 50% of Journeyperson's wages shall work alone on a one person job. All Apprentices may be certified for the use of tools.

10



(e) Employers shall not require that any Apprentice work any day when the Apprentice is required to attend Apprentice Training School unless the Employer has received permission in advance from the Apprentice Training Coordinator.

(f) Qualified Journeypersons on any job site shall serve as a mentor to any Apprentice(s) working on the job, and shall assist in any on-the-job training of the Apprentice(s). Neither the Journeyperson nor the Apprentice shall be docked wages for the time spent performing on-the-job mentoring.

SECTION 2. APPRENTICESHIP COMMITTEE. The parties agree to establish a Joint Apprenticeship Committee composed of an equal number of Union and Associations' representatives. The Joint Apprenticeship Committee shall establish rules and for the administration of the committee.

The Joint Apprenticeship Committee shall be under the jurisdiction of the Joint Board and shall be responsible for the placement and training of Apprentices in the trade of taping the work is available, and in accordance with the rules of the Board.

The conditions of employment of Apprentices shall be regulated by the Joint Board, which shall also have the power to formulate regulations for a system of required employment for Apprentices.

All registered Apprentices are bound by the Agreement they sign, and by all rules and regulations of the Joint Apprenticeship Committee of the Joint Board.

It is the obligation of the Union to advise the Employer, in writing, of any change in the pay status of an Apprentice.

ART. VIII. SECTION 1. PAYMENT OF WAGES.

(a) Wages shall be paid on the job, during regular working hours. The work week shall begin on Wednesday and end on the following Tuesday. Wages shall be paid by check. Payday shall be on Thursday. In the event that payday falls on a holiday, payment shall be made on the day previous thereto. If payment by check is made on Friday, the Employees shall be allowed one-hour off to cash their checks. The Employer shall pay all fees in connection with a dishonored check.

(b) Employees not paid on the day provided for in sub-section (a) immediately preceding, shall be paid two (2) hours pay in addition to the wages due them. If the Employees are not paid by the following Monday at 8:00 A.M., no Employees shall start work on that job until payment is made in full to all workers. In addition to all other sums due them, the Employees shall be paid not less than a full day's wages for that day.



(c) At the time of paying wages, the Employer shall give to each Employee a written statement showing the amount of each and every deduction made from the wages. The statement shall also show the Employee's name and his/her Social Security number.

(d) Payment of cash to an Employee in lieu of proper wages and fringe benefits is prohibited. Any Employer violating this section may be brought before the Joint Board which will determine the fines or penalties to be assessed for the violation.

(e) Every Employer shall keep a complete set of books setting forth all business transactions. These books shall consist of at least a check book, payroll book, cash book and accounts payable and accounts receivable ledger. Such books, and all other employment records of the Employer, shall be made available to the auditor of the Drywall Tapers' Insurance Fund or Annuity Fund or any other Fund established by this Agreement or the Joint Board on the written demand of either. In the event that an Employer shall refuse or fail to make these records available to said auditor upon fifteen (15) day's written demand of such Fund or the Joint Board, and the auditor so certified to the Joint Board, then the entire amount of the Employer's escrow deposit or bond or other security posted with the Joint Board as set forth in sub-division (f) of this Section, shall forthwith become due and payable, and the Joint Board shall apply and pay the same to the Drywall Tapers Insurance Fund to the credit of the Employer. Failure to keep any of the records required in this sub-section shall constitute a violation of this Agreement.

Whenever an audit is required, the Employer shall pay to the Joint Board an audit fee of $300.00 for the auditor's services if books are not made available.

(f) Each Employer, within thirty (30) days after the signing of this Agreement and from time to time thereafter as may be necessary under the terms hereof, shall provide security to the Joint Board as authorized collection agent for the faithful performance by him/her of the requirements under this Agreement for the payment of wages, insurance, welfare, pension and vacation benefits, annuity contributions and penalties of liquidated damages assessed by the Joint Board. Such security may be in the form of cash, proper security bond or other security acceptable to the Joint Board, with which it shall be deposited, and it shall be in the amount of the sum of $20,000.

A further condition of such bond or deposit of security shall be that in the event that the Joint Board shall bring suit against the Employer to recover under this sub-section (f), it shall be entitled, in addition to the sum due therefor to a further amount equivalent to twenty-five percent (25%) of the recovery as the liquidating cost of bringing suit.

(g) The Joint Board shall not accept any bond or other non-cash collateral from any Employer who has failed in the past to make payment within five (5) days' notice of any sums found by the Joint Board to be due under this Agreement, or under a prior Agreement. In such cases, compliance with the escrow deposit requirements hereof shall be by cash deposit only.

12



(h) The Joint Board shall have the power, on two (2) weeks' notice to all Employers, to change or vary the above amounts.

(i) In the event that it shall become necessary for the Joint Board to bring suit against an Employer to collect unpaid wages, wage benefits, insurance benefits, annuity, pension payments or assessments for violation of the Trade Agreement, the Employer shall provide additional security in such form and amount as the Joint Board shall determine. Such security shall be in the form of cash, government bond or bank certificate of deposit or increased surety bond, as the Board in its discretion shall determine, and it shall be deposited by such Employer in escrow to secure payment of such obligation in the future.

(j) Should the Trustees of any of the Funds or the Joint Board or any sub-committee of these bodies find that the liability of any Employer as a result of any delinquency under this Agreement is greater than his/her security deposit, the Joint Board may immediately demand and cause the Employer to increase his/her security to an amount that will at least cover such liability. In such case, such additional security shall be held separately in escrow by the Joint Board as security for the good and faithful performance by the Employer of the terms of this Agreement. Such additional security or any unexpended portion thereof shall be returned to the Employer at the expiration of this Agreement. The Joint Board is hereby authorized for each such Employer's account to pay out of his/her security account any sum found by said Board to be due hereunder from the Employer for unpaid wages, contributions to the Drywall Tapers Insurance Fund, or any other contractual monetary obligation under this Agreement. Within twenty-four (24) hours after notice to any such Employer of such a finding and payment of the Joint Board out of that Employer's security account, the Employer shall replenish and replace in continuing escrow with the Joint Board the exact amount withdrawn and disbursed on his/her account from his/her security account.

(k) The Union shall not enter into a contract with any Employer who is indebted under the terms of this Agreement or any prior Trade Agreement by reason of his/her non-payment of wages, wage benefits, annuities, pensions or penalties or liquidated damages assessed by the Joint Board, whether such Employer proposes the making of such contract under his/her own name or under the name of any firm or corporation in which he is a principal or has substantial interest.

The Union will not sign an Agreement with any Employer who is unable or unwilling to show proof of financial responsibility.

ART. IX. FOREPERSON. Whenever there are five (5) or more drywall tapers on a job, one of the Journeypersons shall be designated by the Employer as a Foreperson. (An Apprentice may not be designated as a Foreperson.) The Foreperson shall receive one (1) hours pay, in addition to the regular wages and overtime payments, for each day's work. The Foreperson shall be required at the Employer's sole discretion to work on the job.

13



When supervisory conditions require the Foreperson to work more than seven (7) hours he may do so without an overtime permit but he shall be compensated for such work on the basis of the rate paid during the seven (7) hours of regular work.

On large jobs requiring assistant Forepersons, these assistant Forepersons shall be paid in the same manner.

All Forepersons shall be drywall tapers or finishers who during the past year have worked the greater portion of their work time within the geographical area covered by this Trade Agreement.

All Forepersons shall have OSHA, Scaffolding and CPR certifications.

ARTICLE X. SECTION 1. JOB STEWARDS.

(a) On any job employing two (2) or more Employees, the Union shall select a Job Steward from among the Employees working on the job.   The selected Job Steward must be a qualified Journeyperson and be certified through the Union's Steward's course and all Employees are eligible to attend the course and become certified.  Once the Job Steward is selected, he/she shall remain on the job as the second to last man on the job.  All Employers outside the jurisdiction of this Union must have a Job Steward from the Union Hall on each job.  The qualifications of Stewards are in the District Council 9 By-Laws.

(b) Unqualified or unproductive Job Stewards may be removed, subject to review by the Joint Trade Committee, which shall convene a hearing within 24 hours.

(c)      (i) If the Union files a grievance in accordance with Article XIII of this Trade Agreement for the use of non-union Employees on the job, or non-payment of wages or fringe benefit stamps or shortages thereof, the Joint Trade Committee shall conduct a hearing within forty-eight (48) hours. All work shall continue on said job pending the hearing.  No postponements of the hearing shall be granted under any circumstances.  If the hearing does not take place within 48 hours because of management's unavailability, the Union reserves the right to stop the job.      (ii)    If the Joint Trade Committee finds that an Employer has committed either of the violations set forth in sub-section (a) above, the remedies shall be as follows:

        (aa) First violation for use of non-union Employee(s):  the union will appoint a Job Steward from the Union Hall on all Employer's jobs employing two (2) or more Employees for a period of one year.

        (bb) Second violation for use of non-union Employee(s):  the Union will appoint a Job Steward from the Union Hall on all of the Employer's jobs employing two (2) or more Employees for the life of this Trade Agreement.

14



(cc) First violation for non-payment or shortage of wages: the Union will appoint a Job Steward from the Union Hall on all Employer's jobs employing two (2) or more Employees for a period of one year.

(dd) Second violation for non-payment or shortage of wages: the Union will appoint a Job Steward from the Union Hall on all of the Employer's jobs employing two (2) or more Employees for the life of this Trade Agreement.

(ee) First violation for non-payment of fringe benefit stamps or shortages thereof for all Employees on the job. The Union will appoint a Job Steward from the Union Hall for the duration of the job on which the violation was committed.

(ff) Second violation for non-payment of fringe benefit stamps or shortages thereof for all Employees on the job: The Union will appoint a Job Steward from the Union Hall on all of the Employer's jobs employing two (2) or more Employees for a period of one year.

(gg) In the event that a Job Steward has been removed from a job, the placed Job Steward will be of the same status (e.g., journeyperson, apprentice) as the Job Steward being removed.

(iii) In the event that there is an individual stamp or wage shortage for an Employee working on a job, the Union will notify the Employer in writing and demand that the Employee be made whole. The Employer will then have forty-eight (48) hours from verified receipt of the Union's written demand to make the Employee whole. If the Employer fails to make the Employee whole within forty-eight (48) hours, the Union may remedy the violation in accordance with subsections (a) and (b) above.

SECTION 2. SHOP STEWARDS.

(a) All new Employers who become parties to this Agreement shall have a Shop Steward appointed by the Union. In shops having the following annual payroll or less, there shall be a Shop Steward who shall be placed solely by the Union:

| | |
|---|---|
| As of January 1, 2017: | $1,150,000.00 |
| As of January 1, 2018: | $1,250,000.00 |
| As of January 1, 2019: | $1,350,000.00 |
| As of January 1, 2020: | $1,450,000.00 |





The annual payroll amounts set forth above shall be based on the calendar year immediately preceding each date set forth above. The annual payroll amounts shall be based on bargaining unit Employees only.

The selected Shop Steward must be a qualified Journeyperson and be certified through the Union's Steward's course and all Employees are eligible to attend the course and become certified.

(b) Unqualified or unproductive Shop Stewards may be removed, subject to review by the Joint Trade Committee, which shall convene a hearing within 24 hours.

(c) Duties of the Shop Steward shall be as follows:

     (i)     The duties of a Steward shall consist of examining the dues books, work cards, and reviewing and reporting for stamp program compliance of the Journeypersons and Apprentices on the job and enforcing Union conditions and proper working conditions.

     (ii)     It is the responsibility of every Employer to submit weekly reports provided by the Union and designated or called "Shop Steward Reports". Failure to submit such reports will result in a fine of five hundred dollars ($500) for each missing report.

SECTION 3. TIME FOR STEWARDS' DUTIES.

(a) A Steward shall perform a fair day's work as a working Journeyperson.

(b) No Steward shall be discriminated against for the proper performance of their duties. Said Steward shall be allowed for the performance of their Steward's duties not less than one hour per day, on jobs having five or more workers.

SECTION 4. STEWARDS' COMMITTEE. There shall be a Stewards' Committee composed of two representatives appointed by the Associations and two representatives appointed by the Union.

SECTION 5. The Stewards' Committee shall hear Employer complaints against Stewards on charges of misconduct or Union complaints of abuse of Stewards' rights and shall meet within 48 hours. The Steward may not be suspended pending the disposition of charges if such failure is due to the absence of the Employer's representatives. He may be so suspended, however, if the Committee's failure to meet is due to the absence of the Union's representatives. A quorum of the Committee shall consist of one representative from each side and its finding shall be decided by unit vote.

SECTION 6. DEADLOCK. In the event the Stewards' Committee deadlocks or otherwise fails to decide any complaint, either party may, within thirty days, refer the complaint to the Joint Trade Board for final and binding decision, in accordance with the rules and regulations of the Board.

I:\pers\CBA\2017-2020-Final020520\18



SECTION 7. The parties agree to establish a joint labor-management committee, the purpose of which is to identify violations of this Trade Agreement by, including but not limited to, reviewing Shop Steward reports and remittance reports. The committee will meet on a regular basis. The committee will hire one full-time staff person whose function will be, among other responsibilities to be determined by the committee, to monitor Shop Steward reports and remittance reports and report to the committee any potential violations of the Trade Agreement for further action by the committee, and to make site visits as necessary to ascertain whether the trade Agreement is being violated.

SECTION 8. A Shop Steward can act as a Job Steward but cannot replace a Job Steward who has already been in place on the job.

SECTION 9. On jobs organized by the Union, the Steward will be selected from the Union Hall.

SECTION 10. A special registration form will be created for jobs that only employ two tapers. The criteria will be small projects and touchups. The form will state the proposed Employees' names. If the Union approves the request, one of the two Employees will be assigned by the Union to monitor the project. If the Employer violates this provision, the Employer will be written up on charges and a Steward will be appointed from the Union Hall. If additional workers are added, then the third taper on the project will be a certified Steward.

SECTION 11. Shop Stewards will be placed January 1st of every calendar year and will remain in the shop for one calendar year.

ART. XI. SECTION I. REGISTRATION OF JOBS. Every Employer shall, twenty-four (24) hours or more before the commencement of any job or operation, file with the Joint Board a written statement of the exact location and nature thereof, including the address, the floor or area, proposed Employees' names, the name of the contractor's client, the type of work required, and the type of construction. In the event that work of the said job is done by any other Employer, such other Employer shall within twenty-four (24) hours or more before commencing work file with the Joint Board a written statement of the work to be performed by the Employer. The statement may be filed with the Joint Board by fax or email.

In the event of any Employer's failure to register as required by this section, the Union may order that Employer's Journeypersons and Apprentices to cease work.

Every Employer shall report to the Joint Board within twenty-four (24) hours the loss of any job.

Every Employer shall report to the Union and Associations within twenty-four (24) hours the stoppage or suspension of any job for failure of payment. All job registrations shall be given a log number and the Employer shall be notified of the same.

17



SECTION 2.

(a) In the event that the Union has ordered an Employer's Journeypersons and Apprentices to cease work as permitted by Section 1 of this Article, the Employer shall stop the job and shall not re-open it until the Union agrees that the Employer is in compliance with this section.

(b) In the event that any job has not begun within thirty (30) days after registration thereof, the Employer shall re-register the job before opening the same and notify the Job Steward. If the Employer fails to re-register, the Job Steward shall receive full pay for the time lost.

(c) In the event that a job is stopped, or Employees are ordered to cease work as provided in this Article, all Employees shall receive full pay for the time lost.

(d) In the event of any violation of this section, the Joint Board shall have authority to levy whatever fines it may deem necessary and determine the working conditions that shall be observed on the job.

ART. XII. BUSINESS MANAGER AND ORGANIZERS. The Union Business Manager and Organizers may visit all jobs and shops for the purpose of ascertaining whether the 'provisions of the Agreement are being carried out.

ART. XIII SECTION 1. GRIEVANCE PROCEDURE. It is agreed that every effort shall be made to settle Employee grievances promptly and amicably through the following procedures of grievance adjustment:

(a) An Employee's grievance shall first be presented by his/her Steward to the Employee's Foreperson. If no satisfaction is reached, the matter shall be referred to:

(b) The Union, which shall review the grievance with the Employer's supervisor or other representative designated by the Employer. If no satisfactory settlement is reached in this step of the grievance procedure, the matter shall then be reduced to writing and referred to:

(c) A Joint Committee, comprised of a representative designated by the Associations and the Business Manager of the Union or representatives respectively designated by each of them. The Joint Committee shall adjust or dispose of the grievance or complaint within forty-eight (48) hours after its receipt or, if it cannot do so, it shall refer the matter to:

(d) The Drywall Taping Industry Board (hereinbefore and hereinafter referred to as the Joint Board), comprised of three (3) members of the Associations, designated by the Associations, and three (3) members of the Union, designated by the Union.

(e) All complaints other than Employee grievances shall be presented to the Joint Committee and/or the Joint Board and disposed of as indicated herein.

18

(f) The Employee may state his/her grievance in writing at any stage of the proceedings.

(g) A report in writing shall be made by the Job Steward, Shop Steward, the Joint Committee and the Joint Board in each case acted upon by them.

(h) This grievance procedure shall not operate as a bar or precondition to suit by the Union or by one (1) or more trustees or participants in one (1) or more of the Funds for collection of contributions owed such Funds by any Employer.

SECTION 2. ARBITRATION.

(a) Representation of the Complainant and Respondent. The Union as a complainant or respondent shall be represented at the hearing by an officer or representative of the Union authorized by its Secretary-Treasurer to act in such capacity, or by the business representative of the local union having jurisdiction over the geographical area where the incident giving rise to the demand to arbitrate occurred. An Associations' Employer as a complainant or respondent, if a corporation, shall be represented at the hearing by an officer thereof, or, if a sole proprietorship, partnership or unincorporated business association, by a principal thereof. If a complainant or respondent is a member of an Employer association recognized by the Union, it may also be represented at the hearing by a duly authorized member of such Associations. A party has the right to be represented at the hearing by legal counsel.

(b) Hearing Procedures. The arbitration hearing shall be conducted by two (2) Chairpersons who shall be members of the Joint Trade Committee, one of whom shall be an Associations' representative and the other, a Union representative. The grievance or dispute, proof of due service of same and any response thereto by the respondent will be presented at the inception of the hearing. The complainant may present witnesses and other evidence in support of the request, and the respondent may present witnesses in its defense. The respondent and complainant will both have the right of cross-examination. The Joint Trade Committee shall be the judge of the relevance and materiality of the evidence offered, and conformity to the state or federal rules of evidence shall not be necessary. The Joint Trade Committee (and any subsequent arbitrators, i.e., the JTB or AAA, pursuant to this Article) shall also consider any alleged violations of the National Labor Relations Act and apply any statutory remedies, if any, with respect to any violation of the National Labor Relations Act.

(c) Nature of Hearings. Hearings shall be as informal as may be reasonable and shall be conducted in the manner considered appropriate by the Chairpersons. The Chairpersons shall have the authority to vary the procedures as they deem necessary in order to insure that each party is afforded a full and fair opportunity to present any and all material and relevant evidence.

(d) Corroborating Witness. Absent extraordinary circumstances, the Union must produce a corroborating witness (i.e., an individual with firsthand knowledge of the violation) to the Joint



Trade Committee in order to meet its burden of proof at a hearing.  There shall be no retaliation against any member who provides witness testimony to the Joint Trade Committee.

(e) Minutes of Proceedings.  Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall the notify the other party and the Joint Trade Committee at least three (3) days in advance of the scheduled hearing date.  The requesting party shall pay the cost of the transcript and a copy of same must be made available at no cost to the Joint Trade Committee upon the conclusion of the hearing.

(f) Postponements.  Except as provided in Article X, Section 1(c)(i), the Joint Trade Committee may, for good cause shown, postpone any hearing upon the request of a party or upon the Joint Trade Committee's own initiative, and shall also grant such postponement when all of the parties agree.

(g) Hearing in the Absence of a Party.  The hearing may proceed in the absence of a party or representative who, after due notice, fails to appear or fails to obtain a postponement.  A decision and award of the Joint Trade Committee or Joint Trade Board shall not be made solely on the default of a party.  The Joint Trade Committee shall require the party who is present to submit such evidence as may be required for the making of a decision.

(h) Interpretation and Application of Procedures, Rules and Regulations.  The Joint Trade Committee and Joint Trade Board shall interpret and apply the above procedures, rules and regulations insofar as they relate to the power and duties of the Joint Trade Committee and the Joint Trade Board, respectively.  If an unresolvable difference arises between the Union and Associations' representatives on the Joint Trade Committee concerning the meaning or application of these procedures, rules and regulations, it shall be resolved and decided by the Joint Trade Board.

## SECTION 3.  ARBITRATION AWARDS.

(a) The Joint Trade Committee will, no later than thirty (30) days after the close of the hearing, adjust or dispose of the grievance or dispute by rendering an award which may include the imposition of fines and/or penalties, and any statutory remedies available under the National Labor Relations Act.  The fines or penalties which may be imposed by the Joint Trade Committee are set forth in the schedule of standardized fines which are made a part of this Article as Section 6.  If a demand for arbitration seeks the recovery of wages and/or benefits, the calculation of those wages and benefits shall be presented and determined at the hearing and the total amounts owed shall be reflected in the award.

(b) In the event the Joint Trade Committee fails to render an award within the time provided in the preceding sub-section (a) or a decision cannot be made due to deadlock of the Joint Trade



Committee, the Joint Trade Committee shall submit the grievance or dispute to the Joint Trade Board, and the Joint Trade Board shall render an award.  The failure of the members of the Joint Trade Board to be present at the arbitration hearing before the Joint Trade Committee shall not . preclude the issuance of an award by the Joint Trade Board.

(c) The awards of the Joint Trade Committee and/or the Joint Trade Board, including an award of fines or penalties, shall be final and binding upon the complainant and respondent and all interested parties, and judgment may be entered upon the award in accordance with applicable law in any court having jurisdiction thereof.

SECTION 4.  FINES AND PENALTIES.

(a) All fines and penalties awarded by the Joint Trade Committee and/or the Joint Trade Board, less the reasonable administrative cost and expenses actually incurred, shall be used to defray the costs of District Council No. 9's enforcement of Joint Trade Committee awards, to advance the industry, to sponsor educational programs for the members in good standing of the Union and their children, to aid and assist in the establishment of programs to increase business activity within the industry and develop and maintain maximum job opportunities for those Union members.

(b) When a Joint Trade Committee or the Joint Trade Board finds that an Associations' Employer is guilty of violating the Trade Agreement, the Joint Trade Committee or the Joint Trade Board may, at its discretion, authorize the Union to designate up to fifty percent (50%) of the JOURNEYPERSONS in the employ of such Associations Employer for a period not exceeding six (6) months, provided that, with respect to violations of Article IV, the remedies set forth in Article IV, Section 1(d) shall be applicable.

SECTION 5. PROTECTION OF COMPLAINANTS.

No Associations' Employer shall dismiss any JOURNEYPERSON for giving evidence at an arbitration hearing.  Such person giving evidence or testimony shall have the protection of the Joint Trade Committee and Joint Trade Board.

SECTION 6. SCHEDULE OF FINES.

The schedule of fines shall be in effect for the duration of this Trade Agreement, or until such time as amended by the Joint Trade Board, will be not less than the following:

Violation 1:    No Registration.

1st Offense

$500.00

2nd Offense

$750.00

21

3rd Offense

> $1500.00 within 12 months, plus the Joint Trade Committee has discretion to implement 50% of the workers on the job from the Union.

Violation 2:   No registration and non-union workers on the job.

1st Offense

> $1500.00 – no registration

> $2000.00 – each non-union worker

2nd Offense

> $2000.00 – no registration, plus

> $5000.00 for each non-union worker, plus the Joint Trade Committee has discretion to implement 50% of the workers on the job from the Union.

Violation 3:   No overtime permit.

1st Offense

> $500.00

2nd Offense

> $1000.00

3rd Offense

> $1500.00 within 12 months, plus the Joint Trade committee has discretion to implement 50% of the workers on the job from the Union.

Violation 4:   No overtime permit with non-union worker on the job.

1st Offense

> $3000.00 – no permit

> $1500.00 – each non-union worker

2nd Offense

> $5000.00 – no permit

22

JDeL
2-6-18

$2000.00 – each non-union worker

3rd Offense

$6000.00 within 12 months, plus $3000.00 for each non-union worker plus the Joint Trade committee has discretion to implement 50% of the workers on the job from the Union.

Violation 5:    Discrimination against Job or Shop Steward or retaliation against "whistleblowers".

1st Offense

Wages and fringe benefits $1000.00 liquidated damages.

Violation 6:    Non-union worker.

1st Offense

$2000.00 for each non-union worker plus $1000.00 liquidated damages

2nd Offense

$5000.00 for each non-union worker plus $1500.00 liquidated damages plus the Joint Trade Committee has discretion to implement 50% of the workers on the job from the Union.

Violation 7:    Subcontracting to non-union Employer

1st Offense

Penalty contingent upon size and scope of project plus $3000.00 liquidated damages.

Violation 8:    Failure to submit Shop Steward Reports or Remittance Reports

1st Offense

$500.00 each missing report

Violation 9:    Failure to pay wages and/or fringe benefits or payment in cash for wages and/or fringe benefits

1st Offense

Tapers CBA2017-2020-Final02052018

> Any wages and fringe benefits owed plus liquidated damages in an amount equal to the unpaid (or cash-paid) fringe benefits only, but no less than $2,000.00

Violation 10:   Use of market recovery or other special rate journeyperson(s) on non-market recovery job(s) or other corresponding operation(s).

1st Offense

Three times the penalty of Violation 6 above.

Applicable to all violations above:

In addition to the penalty listed above with respect to the violations set forth in Section 6 above, with the exception of violations 1 and 8 (addressed above), if a violation is found the Joint Trade Committee and/or the Joint Trade Board shall direct the Union to appoint a Job Steward from the Union Hall for the duration of the job. With respect to violations 1 and 8, in addition to the penalty listed above with respect to violations set forth in Section 6 above, the Joint Trade Committee and/or the Joint Trade Board may direct the Union to appoint a Job Steward from the Union Hall for the duration of the job.

SECTION 7. DEADLOCK OR FAILURE OF THE JOINT TRADE BOARD TO RENDER A DECISION. If the Joint Trade Board deadlocks or otherwise fails to render an award deciding any grievance or dispute within fourteen (14) days of submission to it by the Joint Trade Committee, either party may, within thirty (30) days of the expiration of said fourteen (14) day period, refer the grievance or dispute to arbitration by filing a written request with the Joint Trade Board, with a copy served upon the opposing party. Upon receipt of such request, the Joint Trade Board shall promptly submit such grievance or dispute to arbitration pursuant to the Labor Arbitration Rules of the American Arbitration Association ("AAA"). The decision of the AAA arbitrator shall be final and binding.

SECTION 8. Findings and decisions shall be transmitted to the Associations and to the Union and each obligates itself to enforce such findings and decisions as the case may be.

SECTION 9. COMPLAINTS. No Employer shall dismiss any Journeyperson or Apprentice for making a complaint or giving evidence with respect to an alleged violation of any provision of Agreement prior to the hearing by the Joint Committee or the Joint Board of such complaint. Such complainant shall have protection of the Joint Committee and the Joint Board. In the event of a refusal of an Employer to give employment, the Employer shall be liable for the pay of such Journeyperson or Apprentice for such time lost.

24



SECTION 10. DESIGNATION OF JOURNEYPERSONS AND APPRENTICES. When the Joint Board finds that an Employer is guilty of violating this Agreement, it may, at its discretion, authorize the Union to designate up to fifty percent (50%) of the Journeypersons and Apprentices in the employ of such Employer for a period not exceeding six (6) months, as the Joint Board may decide.

ART. XIV. SECTION 1. JOINT BOARD. The Joint Board shall meet at the call of either of the parties herein upon forty-eight (48) hours' notice.

SECTION 2. The Joint Board shall have the power to compose and to delegate one or more sub-committees consisting of an equal number of the Associations and the Union, who need not be members of the Joint Board, to perform such duties for the Joint Board as it may direct.

SECTION 3. The Joint Board shall have the power to summon before it and to question or examine any Employer signatory to this Agreement or the Union. It shall have the power to require the production of books, papers or other evidence it may deem necessary.

SECTION 4. All complaints to the Joint Board shall be in writing, stating the nature of the complaint.

SECTION 5. Notwithstanding anything to the contrary, a proper quorum of the Joint Board shall consist of any number not less than two (2) but equal from the Associations and the Union, and in which case the decision of such number shall have the same force and effect as if the whole three (3) from the Associations and the Union had acted.

(a) Hearings conducted by the Joint Board, its decision and findings shall be in full force and effect irrespective of the number of representatives either side may have present at hearings.

(b) When voting on a question, complaint or finding the Associations and the Union shall each have one (1) vote and these votes shall be equal irrespective of the representatives present and voting.

SECTION 6. The decisions and findings of the Joint Board, including any imposition of penalties, shall be final and binding upon the signatory contractors and the Union, all members of each thereof and all interested parties.

ART. XV. It shall be a purpose of the Joint Board to plan, develop and effectuate a program designed to provide opportunities for fuller employment by expanding the market for the Taping and Finishing Business, and to administer and to provide for the enforcement for all Trade Agreements not otherwise provided for in this Agreement. The Joint Board shall elect its own officers, appoint its own committees, and formulate rules and regulations not inconsistent with the provisions of this Agreement which shall be binding upon the parties.

25



The Joint Board shall have the authority to employ the necessary help to effectuate its purpose.

The cost of administration necessary to carry out the functions of the Joint Board shall be borne by all Employers in agreement with Local Union 1974 and shall for all purposes constitute an expense of doing business under this Agreement. Commencing June 28, 2017, each Employer shall pay the sum of twenty ($.20) cents per hour for each Journeyperson and/or Apprentice, for the administration of the Joint Board. This contribution shall be included in the prepayment stamp plan. If the Employers fail to pay the administrative charges to the Joint Board, the Joint Board shall have the right to take whatever steps are necessary to recover the administrative charges owing to the Joint Board and the Employer shall be liable for all costs for collections of the payments due together with attorney's fees and such penalties as may be assessed by the Joint Board.

The Joint Board shall contribute to the International Joint Painting, Decorating and Drywall Apprenticeship and Manpower Training Fund a minimum of ten cents ($0.10) for each hour or portion thereof for which Employee receives pay.

The Joint Board shall contribute to the Labor Management Cooperation International Fund a minimum of ten cents ($0.10) for each hour or portion thereof for which an Employee receives pay.

The Joint Board is a continuing body, unless specifically cancelled by a succeeding agreement between the parties hereto. All rules and regulations promulgated by the Board shall continue in force and effect from Agreement to Agreement, unless specifically repealed by the Board or by agreement of both parties to this Agreement.

ART. XVI. SECTION 1. In the event the Employer sub-contracts any job-site work covered by this Agreement, the Employer shall be a guarantor of performance by the sub-contractor of all terms and conditions of said sub-contractor Agreement with the Union or, in the absence of such an event, the Employer shall be liable to the Union for any act or omission of the sub-contractor which in any way departs from or is inconsistent with the terms and conditions of said sub-contractor's agreement with the Union, or, in the absence of such an Agreement, with the terms of this Agreement.

SECTION 2. No Employer shall sub-let or sub-contract any finishing, taping, pointing, skimcoating, spraying other work done by members of the Union to any other person unless:

(a) the Employer has made request to the Union for approval, accompanying such request with a guarantee in writing for the sub-contractor's payment of all contributions that may become due the Funds;

(b) the Union has upon such request given its approval in writing; and

26



(c) the person to whom the work is sub-let or sub-contracted is an Employer under contract with the Union.

SECTION 3. Employers shall not sub-let or sub-contract to Journeypersons or Apprentices any finishing, taping, pointing, skimcoating, spaying or other work done by members of the Union. Journeypersons or Apprentices shall not either directly or indirectly, whether through their spouses or through any other subterfuge, contract to do any taping, finishing or other work covered by this Trade Agreement.

SECTION 4. Each Employer shall notify the Joint Board on the proper form upon receiving contract award from any Builder, Owner Builder, General Contractor, or other contractor. Once any Employer has been awarded a contract, it shall be a violation of this Agreement to sub-contract or re-subcontract the same contract awarded to another Employer.

SECTION 5. No Employer who is a party to this Agreement shall accept or take any job or work on or in any project or building where another Employer has done or performed any taping or finishing work and has not been paid in full; and the Union agrees not to furnish any Drywall Tapers or Apprentices for any job or work where the Employer has not been paid in full for any work, labor, material and services furnished by the Employer.

SECTION 6. PRESERVATION OF WORK CLAUSE.

(a) To protect and preserve, for the Employees covered by this Agreement, all work they have performed and all work covered by this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed as follows: If the Employer performs on-site construction work of the type covered by this Agreement, under its own name or the name of another, as a corporation, company, partnership, or other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (through family members or otherwise), management, control, or majority ownership, the terms and conditions of the Agreement shall be applicable to all such work.

(b) If the Employer violates Section 6 (a) of this Article, the Union may resort to all available legal or economic recourse, including cancellation of this Agreement, or the Union may consider the violation a dispute to be processed in accordance with the provisions of the Agreement on the handling of grievances and the final and binding resolution of disputes. As a remedy for violations of this Article, the Joint Board or Arbitrator shall be able, at the request of the Union, to require an Employer to pay 1) to affected Employees covered by this Agreement, including registered applicants for employment, the equivalent of wages those Employees have lost because of the violations, and 2) into effected Fringe Benefit Funds to which this Agreement requires contributions any delinquent contributions that resulted from violations. The Joint Board or

27



Arbitrator shall be able also to provide any other appropriate remedies, whether provided by law or this Agreement. The Union shall enforce a decision of the Joint Board or Arbitrator under this Article only through arbitral, judicial, or governmental (for example, the National Labor Relations Board) channels.

(c) If, after an Employer has violated this Article, the Union and/or the Trustees of one (1) or more Fringe Benefit Funds to which this Agreement requires contributions institute legal action to enforce an award by an Arbitrator or the Joint Board remedying such violation, or defend an action that seeks to vacate such award, the Employer shall pay any accountants' and/or attorneys' fees incurred by the Union and/or Fringe Benefit Funds, plus costs of the litigation, that have resulted from such legal action. This section does not affect other remedies, whether provided by law or this Article, which may be available to the Union and/or the Fringe Benefit Funds.

SECTION 7. The Associations and the Union agree to the elimination of lumping (the subcontracting of labor without material). Every Employer or sub-contractor must furnish both labor and material complete under one contract.

SECTION 8. The parties agree to quality workmanship based upon job specifications and scope of work. Job specifications shall be available for inspection by the Union. All jobs shall be performed in accordance with the Architects' specifications.

ART. XVII. JOINT HEALTH COMMITTEE. There shall be established a Joint Health Committee consisting of two (2) members of the Union, designated by the Union, and two (2) persons designated by the Associations. The duties of the committee are to make recommendations to both the Union and the Associations on all items of health affecting the taping industry.

ART. XVIII. SECTION 1. HEALTH RULES. The Joint Board shall make adequate and proper provisions for the health and safety of the Journeypersons and Apprentices in connection with their work, and as far as possible protect them from hazards of the trade. It is expressly understood and agreed that Rule 23 of the New York State Industrial Code shall be strictly complied with.

SECTION 2. No Employees shall work where any of these health rules are violated.

SECTION 3.

RULE NO. 1. REST PERIODS. Employees shall take a ten minute morning break and a ten minute afternoon break on 8- hour Project Labor Agreement and special industry 8 hour per day jobs.

RULE NO. 2. ADEQUATE WASHING FACILITIES. Where hot or cold water is not available in or about the clothes locker, a sufficient supply of pails of water and soap powder shall be furnished to the Journeypersons and Apprentices twice a day to provide adequate facilities for clean washing.

Papers\CBA2017-2030-r final\20520 18



No common pail or bucket shall be used for washing by more than five (5) Journeypersons. Five (5) minutes shall be allowed for washing up at noon, and at quitting time.

RULE NO. 3. DRINKING WATER. Fresh drinking water and sanitary cups shall be available to Employees at all times.

RULE NO. 4. EATING PLACE. Employees shall not eat lunch in paint lockers, clothes lockers, or any area where toxic or hazardous materials are stored.

RULE NO. 5. WORK CLOTHES. The uniform of the Journeyperson and Apprentices shall be white overalls, white shirt and cap, and shall be kept clean by the Journeyperson and Apprentices.

RULE NO. 6. CARE OF INJURED. Employees, no matter how slightly injured, must immediately report such injury to the Employer's representative and a Union representative and shall be immediately taken care of by a physician. Any Employee who leaves work because of an injury or to assist an injured Employee shall be paid for the entire day. On all jobs where there are five (5) Employees or more a first-aid kit shall be provided.

RULE NO. 7. USE OF ELEVATORS. On all buildings over six (6) stories in which elevator service is provided for any other trade, such service shall be made available to taping Employees.

RULE NO. 8. The use of tools, to be furnished by the Employer, shall be permitted under OSHA rules and regulations, but shall not be a condition of employment. An Employer found to have violated this provision shall be prohibited from the use of tools for a period of twelve (12) months. Any Journeyperson or Apprentice using the tools must be certified.

RULE NO. 9. Safety masks of any type approved by the Union and by OSHA shall be provided by the Employer to every Employee on every job where either sanding, mixing or spraying is or has been going on. It shall be the duty of the Employer and the Union to require Employees to wear the mask. There shall be no disciplinary action taken against Employer if he supplies the mask to the job if the Employee fails to use the mask. Failure to use the safety mask shall be grounds for dismissal.

RULE NO. 10. No powdered mixtures and no new compounds shall be used unless the Joint Board has granted a variance for such mixture or compound. The joint Board may grant such a variance only if the material is or has been approved either by OSHA or by Mount Sinai School for Experimental Research; however, no variance shall be granted or continued for the use of any mixture that has been disapproved by OSHA. Any mixture for which a variance is granted shall be used only under controlled conditions approved by the Joint Board.

RULE NO. 11. Employees shall not work in the presence of toxic or irritant materials, or any fume or fluid of other material causing pain, injury or dizziness. The Employer and the Union shall be

29

notified immediately of such conditions. If a job determination is in dispute it shall be referred to the Joint Board for a decision.

RULE NO. 12. No Employer shall knowingly permit Employees to work in the presence of toxic or irritant materials, of any fume or fluid or other material causing pain, injury and dizziness.

RULE NO. 13. The Employer shall provide scaffolding and work benches that are safe and of durable construction. The use of buckets in place of scaffolding and work benches prohibited.

RULE NO. 14. No person of violent or oppressive tendencies shall serve as Foreperson, Assistant Foreperson, or Steward. This situation is to be determined by the Joint Board. No person of such tendencies found guilty by the Joint Board shall serve as Foreperson or Steward during the life of the contract.

RULE NO. 15. In order to assure conditions of safety and efficiency, the Joint Board shall promulgate rules to promote the safety of Employees working on high interior scaffolding and swing scaffolding. It is mandatory that a safety belt be used on all swing scaffolds and whenever practicable on high interior scaffolding, and that Employees complete safety training classes in this regard.

RULE NO. 16. No Employee shall work in any area where Asbestos is being removed.

RULE NO. 17. It shall be the duty of the Employer to immediately notify the Union if any asbestos or any asbestos product is being or is to be used or removed on any job.

ART. XIX. All Employers shall carry all insurance required under State and/or Federal Laws. All Employers are required to keep on file with the Union a Certificate of Workers' Compensation and New York State Disability Insurance.

ART. XX. SECTION 1. FRINGE BENEFIT FUNDS.

(a) Contemporaneously with the execution of this Trade Agreement, the parties have entered into trust agreements establishing the following trust funds:

   (i) Drywall Tapers' Insurance Fund;
   (ii) Drywall Pension Fund;
   (iii) Drywall Tapers' Annuity Fund.

Each Employer, whether a member of the Associations or not, agrees to be bound by each of the said trust agreements as though he/she had actually signed the same, and further agrees to be bound by all actions taken by the Trustees of each of the said trust funds pursuant to the said trust agreements.

Tapers GA3017-2020-final 02052018



(b) The parties agree that, in addition to wages to be paid as elsewhere provided in this Trade Agreement, each Employer shall, commencing with the effective date of this Agreement and for the duration thereof, at or before the close of each remittance period, make contributions for such period to the said funds on behalf of each Employee employed by such Employer and covered by this Agreement, as hereinafter set forth below.

(c) Benefit Fund Contributions for all Journeypersons covered by this Agreement shall be as follows:  For the period of June 28, 2017 to   December 26, 2017, each Employer shall make contributions to the funds listed below in the following amounts:

   (i)   Drywall Tapers Insurance Fund: The sum of $8.75 per hour;
  (ii)  Drywall Pension Fund: The sum of $5.00 per hour;
 (iii)  Drywall Tapers Annuity Fund: The sum of $4.80 per hour;
 (iv)  Vacation Fund: The sum of $4.56 per hour;
  (v)  Joint Board: The sum of $.20 per hour;
 (vi)  Drywall Tapers Industry Promotion Fund: The sum of $.25 per hour;
 (vii)  Apprentice Fund: The sum of $.50 per hour;
(viii)  IUPAT Political Action Fund (PAT): The sum of $.10 per hour;
 (ix)  Local 1974 dues check-off: The sum of $2.15

For the period of December 27, 2017 to June 27, 2018, the Fund contributions shall be as allocated by the Union.

For the period of June 28, 2018 to June 27, 2019, the Fund contributions shall be as allocated by the Union.

For the period of June 28, 2019 to June 27, 2020, the Fund contributions shall be as allocated by the Union.

(d) Benefit Fund Contributions for all Apprentices covered by this Agreement who are enrolled in the Three Year Program shall be as follows:  For the period of June 28, 2017 to December 26, 2017, each Employer shall make contributions to the funds listed below in the following amounts:

1st Year Apprentice

   (i)   Drywall Tapers Insurance Fund: The sum of $8.75 per hour;
  (ii)  Drywall Pension Fund: The sum of $2.00 per hour;
 (iii)  Drywall Tapers Annuity Fund: The sum of $0.00 per hour;
 (iv)  Vacation Fund: The sum of $0.00 per hour;
  (v)  Joint Board: The sum of $.08 per hour;
 (vi)  Drywall Tapers Industry Promotion Fund: The sum of $.10 per hour;
 (vii)  Apprentice Fund: The sum of $.50 per hour;

Tapers CBA 2017-2020-Final02052018

(viii)   IUPAT Political Action Fund (PAT): The sum of $.10 per hour;
 (ix)   Local 1974 dues check-off: The sum of $.88

2nd Year Apprentice

  (i)   Drywall Tapers Insurance Fund: The sum of $8.75 per hour;
  (ii)   Drywall Pension Fund: The sum of $3.00 per hour;
  (iii)   Drywall Tapers Annuity Fund: The sum of $2.88 per hour;
  (iv)   Vacation Fund: The sum of $2.74 per hour;
  (v)   Joint Board: The sum of $.12 per hour;
  (vi)   Drywall Tapers Industry Promotion Fund: The sum of $.15 per hour;
  (vii)   Apprentice Fund: The sum of $.50 per hour;
 (viii)   IUPAT Political Action Fund (PAT): The sum of $.10 per hour;
  (ix)   Local 1974 dues check-off: The sum of $1.29.

3rd Year Apprentice

  (i)   Drywall Tapers Insurance Fund: The sum of $8.75 per hour;
  (ii)   Drywall Pension Fund: The sum of $4.00 per hour;
  (iii)   Drywall Tapers Annuity Fund: The sum of $3.84 per hour;
  (iv)   Vacation Fund: The sum of $3.65 per hour;
  (v)   Joint Board: The sum of $.16 per hour;
  (vi)   Drywall Tapers Industry Promotion Fund: The sum of $.20 per hour;
  (vii)   Apprentice Fund: The sum of $.50 per hour;
 (viii)   IUPAT Political Action Fund (PAT): The sum of $.10 per hour;
  (ix)   Local 1974 dues check-off: The sum of $1.72.

     For the period of December 27, 2017 to June 27, 2018, the Fund contributions shall be as allocated by the Union.

     For the period of June 28, 2018 to June 27, 2019, the Fund contributions shall be as allocated by the Union.

     For the period of June 28, 2019 to June 27, 2020, the Fund contributions shall be as allocated by the Union.

(e) Benefit Fund Contributions for all Apprentices covered by this Agreement who are enrolled in the Four Year Program shall be as follows:  For the period of June 28, 2017 to December 26, 2017, each Employer shall make contributions to the funds listed below in the following amounts:

32

1ˢᵗ Year Apprentice

   (i)    Drywall Tapers Insurance Fund: The sum of $8.75 per hour;
   (ii)   Drywall Pension Fund: The sum of $2.00 per hour;
   (iii)  Drywall Tapers Annuity Fund: The sum of $0.00 per hour;
   (iv)   Vacation Fund: The sum of $0.00 per hour;
   (v)    Joint Board: The sum of $.20 per hour;
   (vi)   Drywall Tapers Industry Promotion Fund: The sum of $.10 per hour;
   (vii)  Apprentice Fund: The sum of $.50 per hour;
   (viii) IUPAT Political Action Fund (PAT): The sum of $.10 per hour;
Local 1974 dues check-off: The sum of $.88.

2ⁿᵈ Year Apprentice

   (i)    Drywall Tapers Insurance Fund: The sum of $8.75 per hour;
   (ii)   Drywall Pension Fund: The sum of $2.50 per hour;
   (iii)  Drywall Tapers Annuity Fund: The sum of $2.40 per hour;
   (iv)   Vacation Fund: The sum of $2.28 per hour;
   (v)    Joint Board: The sum of $.20 per hour;
   (vi)   Drywall Tapers Industry Promotion Fund: The sum of $.13 per hour;
   (vii)  Apprentice Fund: The sum of $.50 per hour;
   (viii) IUPAT Political Action Fund (PAT): The sum of $.10 per hour;
   (ix)   Local 1974 dues check-off: The sum of $1.08.

3rd Year Apprentice

   (i)    Drywall Tapers Insurance Fund: The sum of $8.75 per hour;
   (ii)   Drywall Pension Fund: The sum of $3.00 per hour;
   (iii)  Drywall Tapers Annuity Fund: The sum of $2.88 per hour;
   (iv)   Vacation Fund: The sum of $2.74 per hour;
   (v)    Joint Board: The sum of $.20 per hour;
   (vi)   Drywall Tapers Industry Promotion Fund: The sum of $.15 per hour;
   (vii)  Apprentice Fund: The sum of $.50 per hour;
   (viii) IUPAT Political Action Fund (PAT): The sum of $.10 per hour;
   (ix)   Local 1974 dues check-off: The sum of $1.29.

4th Year Apprentice

   (i)    Drywall Tapers Insurance Fund: The sum of $8.75 per hour;
   (ii)   Drywall Pension Fund: The sum of $4.00 per hour;

33

(iii)  Drywall Tapers Annuity Fund: The sum of $3.84 per hour;

(iv)  Vacation Fund: The sum of $3.65 per hour;

(v)  Joint Board: The sum of $.20 per hour;

(vi)  Drywall Tapers Industry Promotion Fund: The sum of $.20 per hour;

(vii)  Apprentice Fund: The sum of $.50 per hour;

(viii)  IUPAT Political Action Fund (PAT): The sum of $.10 per hour;

(ix)  Local 1974 dues check-off: The sum of $1.72.

For the period of December 27, 2017 to June 27, 2018, the Fund contributions shall be as allocated by the Union.

For the period of June 28, 2018 to June 27, 2019, the Fund contributions shall be as allocated by the Union.

For the period of June 28, 2019 to June 27, 2020, the Fund contributions shall be as allocated by the Union.

(f) Such contributions shall be made, on a monthly basis, as follows: Each Employer shall, on or before the end of each remittance period, post on the Drywall Tapers Insurance Fund's computer system, a payroll report for each of the weekly pay periods covered, and pay to the Drywall Tapers Insurance Fund an amount equal to the contributions due from such Employer to the following funds: Pension Fund, Annuity Fund, Insurance Fund, Vacation Fund, Joint Board, Promotional Fund, Apprentice Fund, PAT, and Union dues check-off.

(g) The Drywall Tapers' Insurance Fund shall pay over to each of the other trust funds and the Union moneys equal to the contributions due to them from each such Employer.

SECTION 2. EMPLOYEES WORKING OUT OF TOWN. Employers shall pay contributions to the said trust funds, in the manner described in Section 1 of this Article, whether earned by the Employees while working outside the geographical area described in Article I, Section 1 or while working within that geographical area.

SECTION 3. DEFINITION OF "GROSS WAGES". "Gross wages" and "Gross wages payable" as used in this Agreement shall mean the actual total gross earnings of any Employer's Journeypersons and Apprentices.

SECTION 4. DRYWALL TAPERS INSURANCE FUND. The sums received by the Trustees of the Drywall Tapers' Insurance Fund pursuant to Section 1 of this Article and remaining after the payment over, as provided in paragraph (i) of that Section, of contributions due to the other trust funds, shall be administered and expended by the said Trustees in accordance with the trust agreement establishing such Fund, as amended, for the purpose of:

34



(i) providing such amounts of life, accident and health insurance, hospitalization insurance, prescription drugs, dental care and optical care of Journeypersons and Registered Apprentices, their spouses and children under 26 years of age, as the Trustees way determine, to pay or provide for similar benefits for the Employees of Local Union 1974 of, New York City, the Joint Board, and Employees of this Trust and the dependents of such Employees as the Trustees may determine;

(ii) Setting aside and maintaining as a vacation fund, in a separate and individual account on behalf of each Journeyperson or Apprentice sums received by the Employer, in the amount set forth in Section 1 of this Article, for such Journeyperson or Apprentice. The said vacation fund so maintained on behalf of each Journeyperson or Apprentice shall be paid to such Journeyperson or Apprentice by the said Trustees no less than once a year.

SECTION 5. DRYWALL PENSION FUND. The sums received by The Trustees of the Drywall Pension Fund pursuant to Section 1 of this Article shall be administered and expended by the said Trustees in accordance with the trust agreement establishing such Fund, for the payment of pensions to covered Employees and their beneficiaries.

SECTION 6. DRYWALL TAPERS' ANNUITY FUND. The sums received by the Trustees of the Drywall Tapers' Annuity Fund pursuant to Section 1 of this Article shall be administered and expended by the said Trustees in accordance with the trust agreement establishing such Fund, to make annuities and certain other benefits, including supplemental unemployment benefits to covered Employees.

SECTION 7. ENFORCEMENT.

(a) The contributions hereinabove provided for constitute a consideration for the making of this Agreement and are of its very essence. Failure by any Employer to pay the amounts due from him/her to the Trustees shall be deemed a breach of this Agreement, and in such event the Union may take such steps as it deems necessary to enforce the foregoing and following provisions relating to payment to the Trustees. In the event that an Employer fails to make the required payments for more than four (4) weeks the Union may order his/her Journeypersons and Apprentices to cease work until the payment has been made. Such Employer shall pay all such Journeypersons and Apprentices for all time lost, not to exceed one (1) week's wages per drywall taper.

(b) Any Employer required by this Article to pay the contributions payable to his/her Journeypersons and Apprentices or on their behalf for the remittance period immediately preceding, who fails to pay such contributions within one (1) week of the date prescribed for their payment shall pay to the Trustees as liquidated damages the sum of ten percent (10%) of the required contributions in addition to the required contributions. If any Employer during any calendar year failed to pay such contributions within the prescribed date for more than a total of

35

five (5) weeks and not more than ten (10) weeks, the penalty for such delinquency shall be twenty percent (20%) of the required contributions. If the total is more than ten (10) weeks the penalty shall be thirty percent (30%). Any Employer who has been delinquent a total of more than ten (10) weeks is deemed to have been guilty of having violated the payment of wage clause and is subject to all penalties implicit in such violation.

(c) Any Employer who fails to comply with the preceding paragraph shall be cited before the Joint Board which may, on a finding, in its discretion, impose such penalties and/or liquidated damages as it deems appropriate, aside from and in addition to the liquidated damages provided for above.

(d) It is agreed that the Employer will be bound in all respects by the rules and/or regulations established by the Trustees relating to Employer contributions to the Trust Fund, including rules for resolving any disputes concerning Employer payments or reports to the Trustees.

(e) Should any Employer, after an audit, seek to challenge the result, he shall be entitled on request to a hearing before the Trustees and an opportunity fully to present all available facts, and be subject to open examination thereon, which may establish his/her actual, lower labor cost in the circumstances of his/her particular operations, which would warrant a readjustment from the estimated wage figure to his/her actual total gross earnings figure, as it may appear to the Trustees. If his/her right to any such readjustment is proven satisfactorily, the Trustees shall remit the assessment of the excess contributions. If, after an audit, and a final assessment of further contributions due, the Employer fails, within ten (10) days after written notice thereof given by the Trustees, to request in writing a hearing before them as provided above to protest the assessment and to seek a readjustment of contributions, the Employer shall be deemed conclusively to have consented thereto, with no further recourse.

(f) As a condition to any appeal from an audit report, the Employer shall post security in the sum of the full amount of the fine or of the contributions determined by the audit report to be due.

(g) All delinquencies in fund contributions, in Joint Board fees, and in fines and assessments levied by the Joint Board must be paid up by an Employer before signing any agreement with the Union.

ART. XXI. PROMOTIONAL FUND AND IUPAT POLITICAL ACTION FUND.

(a) Each Employer shall make the following Promotional Fund contributions, which shall be included in the prepayment stamp plan.

From June 28, 2017 through December 26, 2017, each Employer will contribute the sum of twenty-five cents ($0.25 per hour for each Journeyperson; for Apprentices in the three year program each Employer will contribute ten cents ($0.10) per hour for each 1st Year Apprentice; fifteen cents ($0.15) per hour for each 2nd Year Apprentice; twenty cents ($0.20) per hour for each 3rd Year Apprentice; and for Apprentices in the four year program each Employer will contribute ten cents

36

($0.10) per hour for each 1st Year Apprentice; thirteen cents ($0.13) per hour for each 2nd Year Apprentice; fifteen cents ($0.15) per hour for each 3rd Year Apprentice and twenty cents ($0.20) per hour for each 4th Year Apprentice.

For the period of December 27, 2017 to June 27, 2018, the Fund contributions shall be as allocated by the Union.

For the period of June 28, 2018 to June 27, 2019, the Fund contributions shall be as allocated by the Union.

For the period of June 28, 2019 to June 27, 2020, the Fund contributions shall be as allocated by the Union.

The Drywall Taping Contractors' Association established a Drywall Tapers Industry Promotional Fund effective September 1, 1993, which among other things promotes the welfare of the taping industry within the New York Metropolitan Area and provides expanded opportunities for covered Employees. Contributions received from members of the Drywall Taping Contractors' Association shall be distributed to that Association. Reports shall accompany remittance on forms required by the Trustees of the Fund and shall be paid through the Drywall Tapers Insurance Fund. The Drywall Tapers Industry Promotional Fund shall be administered solely by Employers that are members of that Association pursuant to a Declaration of Trust.

Contributions received from members of the Association of Wall-Ceiling & Carpentry Industries of New York, Inc. ("AWCCINY") shall be distributed to the AWCCINY.

Contributions received from all other employers shall be distributed to the Drywall Taping Contractors' Association of Greater New York. The funds so collected and distributed shall not be used for any purpose other than those set forth in the Declaration of Trust.

(b) Commencing June 28, 2017, each Employer shall deduct from every Journeyperson's or Apprentice's wages the sum of ten cents ($0.10) per hour and pay same as a contribution to the International Union of Painters and Allied Trades Political Action' Together Fund (PAT). Each Employer agrees to honor authorization for check-off of political contributions from all Journeypersons or Apprentices who are Union members and who supply such authorization in the form of such other similar form as the PAT shall deem acceptable.

ART. XXII. NO STRIKES OR LOCKOUTS. There shall be no strikes or lockouts in the shops or upon the work of the members of the Associations, but the Union reserves its constitutional right not to work with non-union Journeypersons and Apprentices.

Employees covered by this Agreement shall have the right to respect any legal primary picket line validly established by any *bona fide* labor organization, and the Union party to this Agreement has

37



the right to withdraw Employees covered by this Agreement whenever the Employer party to the Agreement is involved in a legitimate primary labor dispute with a *bona fide* labor organization. Any Employer that has been adjudged by the Joint Board in violation of this Agreement, or of any charge brought against him/her before the Joint Board shall be outside the protection of this section until such time as he is in compliance.

In the case of an Employer who has failed to comply with a decision of the Joint Board, the Union may order his/her Journeypersons and Apprentices to cease work until he is in compliance on any and all jobs.

ART. XXIII. SECTION 1. Journeypersons and Apprentices shall not work for Employers who are not in contractual relations with Local Union 1974 or any council or Local Union affiliated with the IUPAT, it being understood that Journeypersons and Apprentices may work directly for the City and State of New York, and the Federal Government. Contractual relations as used in this diction shall mean a written agreement containing substantially all of the provisions of the Trade Agreement.

SECTION 2. The Union shall not permit Journeypersons or Apprentices to do any work on any non-union Building, except as may otherwise be permitted under this Agreement.

ART. XXIV. JURISDICTIONAL DISPUTES. It is mutually agreed between the parties that in the event of disputes between trades and disputes relative to questions of jurisdiction of trades, the parties will abide by previous decisions as to jurisdiction published in the latest issue of the B.T.E.A. Handbook, commonly known as "The Green Book".

It is mutually agreed between the parties hereto that disputes between trades and disputes relative to jurisdiction of trades not covered by decisions in the latest issues of the B.T.E.A. Handbook, commonly known as "The Green Book", shall be adjusted in accordance with the principles of the New York Plan for the Settlement of Jurisdictional Disputes.

Pending determination of any dispute under the New York Plan for the Settlement of Jurisdictional Disputes, as stated in the previous paragraph, the members of the Union shall remain at work on the project without change of status.

ART. XXV. The term of this Agreement shall be for the period commencing June 28, 2017 and ending June 27, 2020.

ART. XXVI. Without recognizing the applicability of the National Labor Relations Act, and any amendments thereto of general application or specifically applicable to the Building and Construction Industry, the parties agree that they will abide by the provisions of said Act, and by any amendments thereto of general application or specifically applicable to the Building and Construction Industry, and any and all provisions of the Agreement which may be in conflict with

38

the said Act shall be deemed to be modified and amended accordingly so as to conform to and comply with the said Act or any amendments thereto.

ART. XXVII. MARKET RECOVERY.

The Market Recovery Agreement shall apply to residential and hospitality work in Local Union 1974's jurisdictional areas, which currently or has previously been performed by non-union contractors, and shall apply to residential and hospitality work which currently or has previously been performed in Manhattan by non-union contractors. The Market Recovery Agreement shall not apply to prevailing wage work, including without limitation any city, state or federally subsidized projects.

- All work must be approved by the Joint Trade Board or their respective designees, and such approval will not be unreasonably withheld.
- The Standard workday shall consist of 7 or 8 hours a day at the option of the Employer. The length of the workday must be preregistered.
- A registration form for work under the Market Recovery Agreement shall be created.
- An appropriate Market Recovery Stamp for Tapers shall be utilized.
- Work performed under this provision shall come through Local Union 1974. All Journeypersons and Apprentices are eligible to work on such projects.

The following terms shall apply to all work performed under Market Recovery:

- Payroll Costs. For all work performed outside of Manhattan, the wage and benefit rates contained in the Trade Agreement shall be adjusted to provide for a twenty percent (20%) reduction in the payroll costs attributable to applicable wage and benefit rates. This reduction may be accomplished by any lawful method, including direct payroll reductions, targeting program, or any combination thereof, resulting in the equivalent of a twenty percent (20%) reduction in payroll costs (wage and benefit costs)
- The standard workweek shall consist of any 35 or 40 hours in a week, at the Employer's discretion, excluding Saturday and Sunday (which, if worked, will be considered overtime). The length of the workweek for each job shall be preregistered.
- The standard workday shall consist of 7 or 8 hours a day at the option of the Employer. The length of the workday must be pre-registered.
- The Market Recovery Rate does not apply to Apprentices.
  ORGANIZING
- The Joint Trade Board (and not the Joint Trade Committee) shall have full authority to modify the terms of this Trade Agreement, and to pinpoint, maintain and/or organize work covered under this Trade Agreement for the life of the Trade Agreement, with respect to organizing work. Relief shall be available only as long as at least one trade on the job is

39

offering a reduced rate. The Union and the Associations agree that the Joint Trade Board may provide any type of economic relief from this agreement necessary to help recapture the work historically performed by non-union contractors.

ART. XXVIII. The parties to this Agreement adopt the Collectively Bargained Workers' Compensation Alternative Dispute Resolution (ADR) Program.

ART. XXIX. If any Article or Section of this Agreement should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement or the application of such Article or Section to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

In the event that any Article or Section is held invalid or enforcement or compliance with which has been restrained, as above set forth, the parties affected thereby shall enter into immediate collective bargaining negotiations, upon the request of the Union, for the purpose of arriving at mutually satisfactory replacement. Within sixty (60) days after the beginning of the period of invalidity or restraint either party shall be permitted all legal or economic recourse in support of its demands notwithstanding any provisions in the Agreement to the contrary.

ART. XXX. In the event that the Union enters into a contract, or contracts, or enters into renewals or modifications of a contract, or contracts, with any employers performing the work covered by this Trade Agreement which contain new or revised economic terms or other conditions effective on or after June 28, 2017, which economic terms or other conditions are more favorable to such Employers than the terms contained in this Trade Agreement, the Union shall immediately notify the Associations of such more favorable terms, and the Associations and all its members shall be entitled to and may have the full benefit of any and all such more favorable terms, upon notification to the Union. The Union shall also provide written notice to the Associations if it offers to any contractor that is not a member of the Associations the terms set forth in the market recovery agreement. This section does not apply to any agreements entered into by the Union on behalf of Local Union No. 1456 or to any Project Labor Agreements.

40



WITNESS WHEREOF, the parties hereto have caused this Trade Agreement to be signed by their respective officers the day and year first above mentioned.

DISTRICT COUNCIL NO. 9, DRYWALL TAPERS & POINTERS OF GREATER NEW YORK, LOCAL UNION 1974, INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO.

By: _____  BM/St

DRYWALL TAPING CONTRACTORS' ASSOCIATION OF GREATER NEW YORK

By: _____  Sec-Treas.

41

ASSOCIATION OF WALL-CEILING & CARPENTRY INDUSTRIES OF NEW YORK, INC.

By: _____

Executive Director

Feb 6, 2018

42

2-6-18

*# 9164*

## APPENDIX A

### INDEPENDENT AGREEMENT

THIS AGREEMENT, made as of the date indicated herein below by and between

_Toprock Interios Inc_ _____ (Print Name of Company)

Hereinafter designated as the "EMPLOYER" and Drywall Tapers & Painters of Greater New York, Local Union 1974, International Union of Painters and Allied Trades, AFL-C10, hereinafter designated as the "UNION". WITNESSETH as follows:

WHEREAS, the parties hereto desire to establish Terms and Conditions upon which Journeypersons and Apprentices shall work for the EMPLOYER, and

WHEREAS, the parties hereto are cognizant and aware of a certain agreement previously entered into between the UNION and THE DRYWALL TAPING CONTRACTORS' ASSOCIATION OF GREATER NEW YORK and the WALL-CEILING & CARPENTRY INDUSTRIES OF NEW YORK, INC., hereinafter collectively referred to as the "ASSOCIATION", dated June 28, 2017;

NOW THEREFORE, the parties hereto agree as follows:

1.      The aforesaid agreement entered into between the UNION and the ASSOCIATIONS, a copy of which agreement is annexed hereto, is incorporated herein and made a part of this Agreement, and the terms and provisions thereof shall be binding as between the UNION and the EMPLOYER, except as provided in paragraphs 2 and 3 below.

2.      ART. XXII of the said agreement between the UNION and the ASSOCIATIONS, relating to strikes and lockouts, is not a part of this Agreement and the terms and conditions thereof shall not be effective or binding as between the UNION and the EMPLOYER.

3.      ART. XXX of the said agreement between the UNION and the ASSOCIATIONS relating to more favorable terms, is not a part of this Agreement and the terms and conditions thereof . shall not be effective or binding as between the UNION and the EMPLOYER.

4.   All references to the ASSOCIATIONS or any member thereof in the said agreement between the UNION and the ASSOCIATIONS shall be interpreted to refer to the EMPLOYER.

5       The duration of this Agreement shall be as provided in the agreement between the UNION and the ASSOCIATIONS incorporated herein; and the terms of this Agreement shall be effective June 28, 2017.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective officers on the day written below.

TapersCBA2017-2020-Final02052018

2-6-18

DISTRICT COUNCIL NO. 9, DRYWALL TAPERS & POINTERS OF GREATER NEW YORK, LOCAL UNION 1974, INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO

By

_Kevin Sheridan - Toprock Interiors_
(Print Employer Name)

By:    _Kevin Sheridan_
Signature of Employer

Print Name: _Kevin Sheridan_

Dated Signed: _7/12_ , 2018

Print Name, Address, Telephone and Fax Numbers of Employer:

Toprock Interiors, Inc.
245 E 54th St, 2S
NY, NY 10022
212-826 4239
FAX 646 217 3092

SDL
2-6-18